## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DERRICK JACKSON, individually as )
Husband and Heir-at-Law and as CO-SPECIAL )
ADMINISTRATOR OF THE ESTATE OF )
KAREN JACKSON a/k/a KAREN DAY, )
deceased, et al., )          **CIVIL ACTION**
)
                    Plaintiffs, )          **No. 13-1376-KHV**
)
v. )
)
CITY OF WICHITA, KANSAS, et al., )
)
                    Defendants. )
_____ )

## MEMORANDUM AND ORDER

Plaintiffs are Derrick Jackson, individually as husband, heir-at-law and co-special

administrator of the Estate of Karen Jackson, a/k/a Karen Day, deceased; Tyra Williams, daughter

and heir-at-law of Karen Jackson and co-special administrator of the Estate of Karen Jackson; Ernest

Day, son and heir-at-law of Karen Jackson; and Shanta Day, daughter and heir-at-law of Karen

Jackson. Plaintiffs sue the City of Wichita, Kansas (the "City") and Wichita police officers

Elizabeth Martin and Bryan C. Knowles.[1] Specifically, under 42 U.S.C. § 1983, plaintiffs assert

claims for excessive force in violation of the Fourth Amendment and Fourteenth Amendments.[2] See

---

[1]     Derrick Jackson proceeds pro se; counsel represent remaining plaintiffs.

[2]     Under Section 1983, plaintiffs also assert claims against the City for failure to train
and unconstitutional policy in violation of the Fourth and Fourteenth Amendments. See Pretrial
Order (Doc. #136) filed June 1, 2016 at 10-11. In response to defendants' motion for summary
judgment, plaintiffs waive those claims. See Plaintiff's [sic] Response In Opposition To
Defendants' Motion For Summary Judgment ("Plaintiffs' Response") (Doc. #183) filed August 29,
2016 at 71. Likewise, pro se plaintiff Derrick Jackson provides no evidence in support of such
claims. See Plaintiff [Derrick Jackson's] Response To Defendants Motion Of Summary Judgment
("Derrick Jackson's Response") (Doc. #174) filed July 28, 2016. Accordingly, the City is entitled
(continued...)

Pretrial Order (Doc. #136) at 10-12.  In addition, plaintiffs assert wrongful death and survival claims under Kansas law for negligence and battery.[3]  See id. at 13.  This matter comes before the Court on defendants' Motion For Summary Judgment (Doc. #143) filed June 27, 2016.  For reasons stated below, the Court sustains the motion in part.

## I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets its burden, the burden shifts to the

---

[2](...continued)
to summary judgment on plaintiffs' claims of failure to train and unconstitutional policy.

Plaintiffs do not specify whether they sue Martin and Knowles in their individual and/or official capacities.  The parties stipulate that during the events in question, Martin and Knowles acted within the course and scope of their employment as officers of the Wichita police department. See Pretrial Order (Doc. #136) filed June 1, 2016 at 3.

[3]    Plaintiffs do not specify whether they assert all state law claims against all defendants.  See Pretrial Order (Doc. #136) at 12-13.  Plaintiffs originally asserted a claim for negligent infliction of emotional distress but abandoned the claim in the pretrial order.  See Amended Complaint (Doc. #43-1) filed July 7, 2014 at 25-26; Pretrial Order (Doc. #13) at 13, ¶ 6.

nonmoving parties to demonstrate that genuine issues remain for trial as to those dispositive matters for which they carry the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  To carry this burden, the nonmoving parties may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

## II.    Facts

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiffs.[4]

---

[4]      The Court includes only those facts which are material to defendants' motion and disregards any facts which are not supported by record citations.

As noted, Derrick Jackson proceeds pro se.  He filed a separate response to defendants'
(continued...)

A.      Wichita Police Department

Martin and Knowles worked as police officers for the Wichita Police Department ("WPD").[5] To be certified as a law enforcement officer for WPD, one must complete 22 weeks of basic academy instruction and 40 hours of annual continuing education.  WPD officers undergo training twice a year on various topics.  Before joining WPD, Martin served in the Marines and completed 13 weeks of basic training.  Martin also completed police academy training and received training regarding the Taser, handgun, self-defense and basic knife skills.[6]  Knowles began working as a police officer in December of 2009, after he graduated from the police academy.[7]  Since then, he has completed 40 hours of continuing education each year.

WPD wants its officers to use the least amount of force necessary to accomplish a given objective, i.e. the least amount of necessary force is the maximum amount of force that an officer should use.  Under WPD Policy 4.103, officers shall limit the drawing and display of firearms to situations "[w]hen a member, in the exercise of sound judgment, has reason to fear for his/her personal safety or for the safety of others."  WPD Regulation 4.0, Defendants' Ex. 18.

In 2007 and 2008, Sergeant Dan Oblinger helped establish a Crisis Intervention Team

---

[4](...continued)
motion for summary judgment.  See Derrick Jackson's Response (Doc. #174).  Although the response does not comply with D. Kan. Rule 56.1(b), the Court considers it in conjunction with the entire summary judgment record.

[5]      The record does not reflect when Martin and Knowles began working as Wichita police officers or whether they continue to do so.

[6]      The record does not indicate when Martin served in the Marines or when she attended the police academy.

[7]      The record does not reflect whether Knowles first began working in WPD or another police department.

("CIT") for WPD.  The purpose of CIT is to help someone who is in crisis with mental health issues.

Oblinger wrote most of the CIT policy and from 2008 to 2012, he served as a CIT instructor.

Approximately ten per cent of WPD officers are trained in CIT.  According to Oblinger, the first

thing an officer should do on any call – regardless whether it is a CIT call – is secure safety for

everyone.

WPD Policy 519 pertains to situations involving mentally ill persons.  In part, it provides as

follows:

> The Wichita Police Department recognizes the challenge that chronic behavioral crises related to mental illnesses, substance abuse, intellectual disability, and other conditions pose to community safety, stability, and emergency services. The primary police function when responding to mental health crisis calls is to restore order by deescalating the incident and referring the citizen in crisis to appropriate treatment. Ideally, arresting a mentally ill person should be reserved for violent and/or serious crimes. The best option in all other situations is mental health treatment. Persons with mental illness are citizens in full-standing and of equal dignity to all other citizens and should receive an equivalent level of care.  * * *
>
> CIT Officers with appropriate backup are the preferred response to all calls involving mental health crisis. If a supervisor or an on scene officer determines that the incident requires a specialized intervention, then they may request that a CIT Officer be dispatched to their location, to assist them. Once on-scene, the CIT officer should be given wide latitude in handling the call. The CIT officer will work with the controlling supervisor to decide how to handle the mental crisis component of the call. The CIT officer will work with the other responding officers to decide how to handle any criminal acts related to the crisis call.

WPD Policy 519, Defendants Ex. 13.

WPD trained Martin as a CIT officer.  As such, Martin completed 40 hours of specialized

CIT training.  The training taught how to recognize mental health issues such as depression, bipolar

disorder, schizophrenia, post-traumatic stress disorder and attention deficit disorder.  It also taught

calming and de-escalating techniques.  Martin learned that in dealing with a suicidal person, time

is on her side and she should try to enlarge that time as much as possible.  See Martin Depo. at

247:16-25.  Martin testified that CIT training instructed her to initially approach a scene with a mentally ill person in the same way that she approached any other scene.  Martin understands that WPD policy requires officers to evaluate whether a mentally ill individual has committed a crime and to determine if he or she needs to go to the hospital.  If the mentally ill person is suicidal or homicidal, WPD policy requires that officers take the person to ComCare or a hospital.[8]  When responding to a mental health crisis, Martin's primary goal as a CIT officer is to provide help to the mentally ill person, i.e. to listen to the person, see what she can do to help and determine if the person needs to go to a hospital, ComCare or jail.

Martin trained on a scenario which involved an individual with a knife and two police officers.  Her goal was to communicate with the other officer and Taser the person before he or she could approach the officers.  See Martin Depo. at 252:4-12.  Instructors taught her to communicate to the other officer that she was transitioning to a Taser and have the other officer keep his or her gun drawn.  See id. at 13:16.  Martin learned that in these situations, time is on the officers' side and they should move to create a situation that will allow them to use a Taser.  Id. at 293:5-10.  Martin successfully completed training wherein one officer transitioned to a Taser and used it on an individual before he approached the officers with a knife.

On March 21, 2012, WPD supervisors placed Martin on a 90-day improvement plan due to repeated failure to "do a complete and thorough investigation," "gather more information from witnesses on the scene of an incident" and "gather more detailed information."  Martin Performance

---

[8]       The record does not reflect what ComCare is.

Appraisal, Plaintiffs' Ex. X.[9]

B.    Karen Jackson

Karen Jackson was a 45-year-old female who suffered from mental illness.[10] She had trouble with her hips and walked with a noticeable limp.  Karen Jackson walked slowly, had difficulty going up and down steps and always needed to use a handrail.  She sometimes used a scooter or wheelchair to go long distances and she sometimes used a cane when she had bad pain.    See Plaintiffs' Response (Doc. #183) at 34, ¶¶ 65, 67.

In 2011, Karen Jackson married Derrick Jackson.  On May 30, 2012, Karen Jackson filed a verified petition requesting an order of protection from abuse ("PFA order") from Derrick Jackson, asserting fear of injury and verbal intimidation.  On June 7, 2012, the District Court of Sedgwick County entered a PFA order that restricted Derrick Jackson from any contact with Karen Jackson. The PFA order did not address who was entitled to their housing or property.  See PFA Order at 2-3, Plaintiffs' Ex. S.

C.    Events of July 10, 2012

On July 10, 2012, Karen Jackson went to the residence of Derrick Jackson at 708 N. Spruce in Wichita, Kansas.  Derrick Jackson asked her to leave.  Karen Jackson refused to leave and told him that she could tear up the PFA order.  Around 9:00 p.m., Derrick Jackson called 911 to inquire

---

[9]        The 90-day improvement plan period ended on June 19, 2012.  The record does not reflect whether Martin successfully completed it.

[10]        Plaintiffs assert that Karen Jackson suffered from severe major depression and post-traumatic stress disorder, but they do not provide record support for the assertion.  See Plaintiffs' Response (Doc. #183) at 44 ¶ 1 (citing Ex. R – Wichita 010314-Wichita 010315).  Defendants agree that Karen Jackson had "some mental health issues."  Corrected Reply In Support Of Defendants' Motion For Summary Judgment (Doc. #195) filed November 14, 2016 at 27, ¶ 1.

about the PFA order.  Officer Salcido told Derrick Jackson that while he could not give legal advice, he thought that a court would need to revoke the order.

At 10:17 p.m., Derrick Jackson again called 911.  He complained that Karen Jackson was still at his house and would not leave.  During the call, Derrick Jackson was walking away from his residence.  He told the 911 operator that no one was hurt and no weapons were involved, that Karen Jackson was his wife and had a PFA order against him, and that she was at the house by herself and did not have a vehicle.  Derrick Jackson said that he just wanted Karen Jackson to go home and she was saying, "I am home."  Plaintiffs' Ex. B.  Derrick Jackson said that Karen Jackson was "on disability for mental."  He further stated as follows:

> I mean I'm not trying to get nobody in trouble.  And she's gonna put on a show, and I don't want them to be offended, because that's just how she is. You know, hopefully they won't, you know, be rough because . . .  it's just that kind of emotional thing but I just don't want there to be no problems."

Plaintiffs' Ex. B.

The 911 operator dispatched Martin and Knowles to the residence for a "disturbance."[11]  The operator informed the officers that someone would not leave the residence and that no weapons or injuries were reported.  The operator informed the officers that Derrick Jackson was walking away from the residence.  At some point, the operator learned that the person who would not leave, i.e. Karen Jackson, was Derrick Jackson's wife.  At 10:20 p.m., the operator changed the call from "disturbance" to "domestic violence disturbance."  Three minutes later, at 10:23 p.m., dispatch reported that "female is on disability for mental issues . . . she is known to put on a show."  CAD

---

[11]     The record is unclear regarding what time the initial call went out.  The parties dispute whether the dispatcher called the officers for a "disturbance," "domestic disturbance" or "domestic violence disturbance."

Report at Wichita 000273, Plaintiffs' Ex. C.

At 10:23 p.m. Knowles arrived at the corner of Murdock and Ash streets, where Derrick Jackson was waiting.[12]  Derrick Jackson told Knowles that Karen Jackson had a PFA order but that he had the right to be at the residence and wanted her to leave.  Knowles called the Sedgwick County Sheriff's office to verify the information that Derrick Jackson told him regarding the PFA order.

At 10:25 p.m., while Knowles was on the phone, Martin arrived and began talking with Derrick Jackson.  Derrick Jackson told Martin that Karen Jackson had a PFA that she wanted to tear up, but he had explained to her that a judge had to dismiss it.  Derrick Jackson said that he left the house because he did not want to get into trouble.  Derrick Jackson asked Martin for help.  He said that he just wanted an understanding that if Karen Jackson was not supposed to be at 708 N. Spruce, she would go home.  He told Martin that Karen Jackson had some mental issues and had trouble comprehending things, and he asked if the officers could take it easy with her and "be a little more considerate with her."  Derrick Jackson Taped Interview at 26, Plaintiffs' Ex. I; Derrick Jackson's Response (Doc. #174) at 2.  Martin did not ask any follow up questions regarding Karen Jackson's mental condition.

Based on his communication with the Sedgwick County Sheriff's office, Knowles understood that a PFA order was in place which determined that Derrick Jackson – not Karen Jackson – was entitled to be at the residence.[13]  After completing the call, Knowles relayed his

---

[12]     The corner of Murdock and Ash streets is a couple of blocks away from the residence at 708 N. Spruce.  See Defendants' Memorandum In Support Of Summary Judgment ("Defendants' Memorandum") (Doc. #144) filed June 27, 2016 at 5 ¶ 17.

[13]     As noted, the PFA order did not address who was entitled to housing or property.
(continued...)

understanding to Martin.

Knowles does not remember asking whether Karen Jackson was alone at the residence. He did not ask about her state of mind or whether she was intoxicated, had a weapon or had been violent. Knowles admits that those questions could have been important. Although the police cars had computers with access to records regarding the call, the officers did not look up information on Karen Jackson. Had they done so, they would have learned that WPD had flagged Karen Jackson as "mental" and they could have looked up previous cases, including a time when Karen Jackson tried to cut her own wrists.[14]

Martin knew that she was going to a mental health call. She did not ask dispatch to send a CIT officer because she was CIT certified. Martin Depo. at 59:3-7. Martin admits that it is best to first collect all information that you can from whatever sources are available. Martin did not request additional information over the radio. Despite knowing that Karen Jackson was "mental," Martin did not do any preparation or research before going to the scene. Martin treats scenes involving a mentally ill person in the same way that she treats any other scene. Martin Depo. at 263: 22-25. Martin planned to tell Karen Jackson that she could not rip up the PFA and that if she wanted to have the PFA dismissed, she would have to go to court and have a judge do it. Martin Depo. at 50:9-13. Martin planned to tell her that Derrick Jackson had rights to the house and that she needed to leave. Id. at 50;14-15. Martin did not communicate her plan to Knowles. Id. at 50:18-21.

---

[13](...continued)
See PFA Order at 2-3, Plaintiffs' Ex. S. Knowles did not review an actual copy of the PFA order, and plaintiffs do not assert that he understood otherwise. See Plaintiffs' Response (Doc. #183) at 9-10, ¶ 25. Plaintiffs assert that the information which Knowles learned from the Sedgwick County Sheriff's office is hearsay, but defendants do not submit it to prove the truth of the matter asserted.

[14]      WPD records listed Karen Jackson as "disabled" for employment purposes.

No emergency existed and the officers had no need to rush to the residence.  Nevertheless, they left immediately to go to the house to talk with Karen Jackson and have her leave.  The officers did not discuss a plan beforehand.  They could have easily taken time to gather more information from Derrick Jackson, but they did not do so.  Indeed, if Karen Jackson had left the house on her own accord, the problem would have been solved.  Karen Jackson was not violating any laws: the PFA order applied only to Derrick Jackson and was not a mutual PFA.

Martin and Knowles drove separate vehicles, parked just past the first house to the north of the residence and walked south to the residence.[15]  At 10:30 p.m., Knowles and/or Martin radioed dispatch that they were at the scene, i.e. 708 N. Spruce.  See Plaintiffs' Ex. C, Wichita 000278.[16]

As they walked to the residence, Martin told Knowles that Derrick Jackson said that Karen Jackson was "6300," or "mental."[17]  The officers did not discuss the matter.  Knowing that Karen Jackson was "mental" did not change the way that they approached the house.  Although Martin was the senior officer and "specialized" in CIT, she allowed Knowles to take the lead because it fell in his territory or "beat" and it was therefore common procedure for him to take the lead.  Martin does not recall that Knowles had any training in CIT.  Martin Depo. at 59:19-20.  In fact, WPD did not

---

[15]     Martin and Knowles did not turn on their sirens or overhead lights.  Martin does not remember if she turned off the headlights as they drove near the residence, although she usually does that so that "they won't see us approaching."  Martin Depo. at 67:22 to 68:7.  Martin wore a brown uniform with a bullet proof vest, a Smith & Wesson .40 caliber service pistol, a Taser, a 12-inch flashlight and a 30-inch expandable baton.

[16]     Defendants contend that as he pulled onto Spruce, Knowles radioed that they were on the scene.  See Defendants' Memorandum (Doc. #144) at 6, ¶ 28.

[17]     "6300" is a broad description for someone with mental problems or psychiatric issues such as bipolar disorder, depression or schizophrenia.

train Knowles how to recognize someone in mental health crisis.  Knowles Depo. at 83:4-10.[18]

As they approached the driveway at 708 N. Spruce, Knowles heard noises and saw the outline of a white female, who turned out to be Karen Jackson, standing inside the front door of the residence.  It was dark and the house had no lights on.  When the officers were on the sidewalk as it crossed over the middle of the driveway, they saw that the person in the doorway was stepping onto the front porch.[19]  At that time, Knowles saw that the person was holding a fireplace lighter, a can, a liquor bottle and a kitchen knife that was wedged between her left forearm and body with the blade sticking up toward her face.  Knowles estimated that the blade was at least ten inches long.[20]

As Knowles crossed past the driveway and Karen Jackson stepped out of the house, Knowles drew his gun.[21]  He continued to walk south about ten to 15 feet past the driveway.  Karen Jackson

---

[18]     When Martin told Knowles that Karen Jackson was 6300, he did not ask Martin to take the lead on the call.  Knowles does not know whether he knew that Martin was CIT trained.  Knowles admits that "6300" could mean anything awful like a deranged serial killer to someone with minor mental problems; he did not know what end of the spectrum Karen Jackson fit into.

[19]     The porch was approximately four feet by four feet.  See Plaintiffs' Response (Doc. #183) at 25, ¶¶ 43(b) and (c).  The driveway was two steps down from the porch.  See Defendants' Exhibit 7.

[20]     Plaintiffs contend that the blade was less than nine inches, but the Court cannot locate the evidence which they cite in support.  See Plaintiffs' Response (Doc. #183) at 23, ¶ 41 (citing Bates Wichita 007416).

[21]     Knowles testified that because Karen Jackson was holding the knife in an uncommon way, he perceived her as a threat to his ability to approach and talk with her, which he needed to do to resolve the call.  See Knowles Depo at 188:1-12, 192:2-24, Defendants' Ex. 1.  Knowles admits that it was not illegal for Karen Jackson to hold the knife on the porch and that he could have contacted her from a distance.  Id. at 187:14-18, 19:6-9.  Knowles said that at the time, he perceived that Karen Jackson was about 20 feet away from him.  Id. at 192:17-18.  He and Martin had been trained on the "21-foot rule," i.e. that before you can draw your gun and fire, a subject can close 21 feet and cut you with a knife.

did not say anything.  Knowles immediately pointed his gun at Karen Jackson and yelled repeated commands for her to drop the knife.[22]  At the time, Knowles stood approximately 30 feet from Karen Jackson.  See Plaintiffs' Ex. AA; Knowles Depo. at 243:17-19.[23]  When Martin heard Knowles tell Karen Jackson to drop the knife, she pulled her gun.[24]  At the time, Martin stood approximately 35 feet from Karen Jackson.  See id.  Martin commanded Karen Jackson to drop the knife and shined her flashlight on Karen Jackson to get a better view.[25]  Knowles and Martin did not identify themselves as police officers.

After Knowles pulled his gun and yelled at Karen Jackson to drop the knife, Karen Jackson began screaming at the officers to "kill me, shoot me."  Martin testified that Karen Jackson also said other things which she could not recall.[26]  Martin Depo. at 117:8-13.

---

[22]   In his deposition more than three years later, Knowles testified that he first said, "Karen, drop the knife" before becoming more abrasive with his commands.  See Knowles Depo. at 172:2-25, 173:5-8, Plaintiffs' Ex. G.  In a taped interview immediately following the incident, Knowles said that he immediately drew his weapon and began yelling at her to drop the knife.  See Knowles Recorded Interview at 10, Plaintiffs' Ex. H.  Construing the record in the light most favorable to plaintiffs, he did not address Karen Jackson by name.

[23]   Knowles Deposition Exhibit 63 (plaintiffs' Exhibit AA) depicts a scaled diagram of the 700 block of North Spruce.  On the diagram, Knowles marked where he and Martin stood when they drew their guns and told Karen Jackson to drop the knife (marked with O and their initials).  See Plaintiffs' Ex. AA; see also Knowles Depo. at 243:17-19.

[24]   Martin did not see the knife until Knowles told Karen Jackson to put it down.

[25]   A benefit of shining the flashlight on someone is that "[s]ometimes they can't really see you."  Martin Depo. at 94:19-24.  Knowles initially shined his flashlight on Karen Jackson as she came out of the house.  Knowles put his flashlight away at an unspecified time.

[26]   Tosha Reed, a neighbor, was outside on her porch when the police arrived.  Derrick Jackson had called Reed to tell her that the police were coming and asked her to go outside and look.  Reed Depo. at 38:15 to 39:3.  Reed saw Karen Jackson come out of the house and heard her yell, "Go get that nigger."  Reed Depo. at 14:3-6; 39:23 to 40:6.  Reed did not hear Karen Jackson say anything else and did not hear the officers say anything.  Id. at 42:17 to 43:12.  The record does not

(continued...)

While Karen Jackson was on the porch, she dropped the liquor bottle and grabbed the knife with her right hand and started swinging it.[27]  At first, Knowles did not know what she was doing. He then noticed that Karen Jackson was stabbing herself in the chest and maybe on her upper legs. See Knowles Depo. at 222:11-25.  Knowles saw that Karen Jackson was bleeding.  Martin saw Karen Jackson stabbing herself in the chest.  As Karen Jackson was stabbing herself, Knowles and Martin continued to tell her to drop the knife.  Martin tried to keep a view on Knowles and decide whether she could transition to a Taser and how to prevent Karen Jackson from stabbing herself and hurting the officers.[28]

_____

[26](...continued)
reflect the distance from Reed's porch to the porch on which Karen Jackson was standing.

Based on Reed's testimony, plaintiffs attempt to controvert whether Karen Jackson yelled at the officers to "kill me, shoot me." See Plaintiffs' Response (Doc. #183) at 33-34, ¶ 64.  Without information regarding the Reed's proximity to the incident, plaintiffs have not demonstrated a material fact issue in this regard.

[27]      Karen Jackson continued to hold the fireplace lighter.  The parties dispute whether she continued to hold the can.  Defendants contend that she threw it onto the driveway.  Plaintiffs contend that she carried it with her onto the driveway and then dropped it.

After the shooting, an unbroken bottle was found on the ground close to the porch.  See Plaintiffs' Ex. DD, Wichita 000409.  The can was found on the driveway several feet in front of the porch stairs.  See Plaintiffs' Ex. DD, Wichita 000408.  A photograph depicting the can shows two spots of liquid on the driveway.  See id.  One spot circles the can and the other is between the can and the front porch step.  See id.  Plaintiffs assert that the spots of liquid suggest that the can was poured out in one spot and then dropped in another spot.  See Plaintiffs' Response (Doc. #183) at 30, ¶ 59.  Plaintiffs contend that the can was laying six feet from stairs, but they provide no support for the measurement of distance.  See Plaintiffs' Response (Doc. #183) at 30, ¶ 19.

[28]      Martin testified that she did not transition to a Taser because Karen Jackson rushed off the porch and came toward her and Knowles with the knife.  Martin Depo. at 149:21-24.  Martin stated that she did not have time to communicate with Knowles about using a Taser.  Martin Depo. at 252:23-25.  Martin did not know how long it would take to transition from her gun to a Taser. Id. at 243:15 to 18.  She has trained on that drill but did not know how many times and could not say whether it was once or a hundred times.  Id. at 243:24 to 244:13.  Her most recent Taser training
(continued...)

After standing on the porch for 45 to 60 seconds, Karen Jackson stepped down to the driveway and walked toward the officers.[29] She held the knife level at stomach level with the blade pointing out.  See Martin Recorded Interview at 11, Plaintiffs' Ex. F; Martin Depo. at 93:10-13, 346:3-4.  Karen Jackson did not swing the knife and did not verbally threaten the officers.  Martin Depo. at 137:5-7; 345:3-4.  She continued to say "shoot me."  Martin and Knowles took two or three steps back.  Nothing blocked them from stepping back further.[30]  Knowles Depo. at 229:14-23.  They continued to point their guns at Karen Jackson and yell for her to stop and/or drop the knife.  Martin kept her flashlight pointed on her.

Karen Jackson walked about 15 feet and stopped on the east side of the sidewalk in the driveway, almost to the sidewalk.  Martin and Knowles continued to yell at her to drop the knife. They did not say anything else to her.  Karen Jackson continued to hold the knife pointed up.  She did not swing it at the officers or threaten to hurt them.  See Martin Depo. at 347:3-16.  Martin told herself that if Karen Jackson took another step, she would have to shoot her.  Id. at 145:5-14.  In other words, Martin drew an imaginary line in the sand and told herself that if Karen Jackson

---

[28](...continued)
was six years earlier, at the police academy.  Id. at 242:21 to 243:4.  Martin did not know what tools she had at her disposal to keep Karen Jackson at a distance.  Id. at 241:5-7.

Knowles had also trained on transitioning from a gun to a Taser.  Knowles Depo. at 101:9-15.  Knowles testified that he could have transitioned to a Taser with Martin in a lethal cover position beside him.  Id. at 237:18 to 238:2.

[29]     Martin described her approach as a "fast walk."  Recorded Interview of Martin at 20, Plaintiffs' Ex. F.  Knowles described it as "not running just walking um a steady pace walking and closing the gap."  Recorded Interview of Knowles at 11, Defendants' Ex. 11.

[30]     Knowles said that he took two steps back and did not go back further because he knew that he would have to step over the curb and he did not want to walk backwards when she was walking toward them.  Knowles Depo. at 199:23 to 200:3.

crossed the line, she would shoot.  Id. at 10-14.

Karen Jackson took another step.  She did not run or charge at the officers.  Martin Depo. at 346:22-24.  Martin fired twice.[31]  Knowles heard the shots and fired twice.[32]  Martin may have fired again.  At the time of the shooting, Karen Jackson was standing between ten and 15 feet from Knowles and about 15 feet from Martin.  See Plaintiffs' Ex. AA.[33]

As she was shot, Karen Jackson turned and fell face forward toward the house.  See Knowles Recorded Interview at 27.  Within seconds of the shooting, Martin radioed for help.  The dispatch entry shows radio contact from Martin at 10:32 p.m. indicating that shots had been fired.  This entry is one minute and 40 seconds after the entry which indicates that the officer arrived on the scene at 10:30 p.m.  Martin and Knowles did not administer first aid to Karen Jackson.

Karen Jackson died of multiple gunshot wounds.  See Autopsy Report at 10, Plaintiffs Ex. II.

---

[31]  In an interview following the incident, Martin said that she fired when Karen Jackson took another step, because she felt like Karen Jackson was going to rush them.  See Martin Recorded Interview at 9-10, Plaintiffs' Exhibit F.  Based on Karen Jackson's demeanor, Martin thought that she intended to hurt Martin and/or Knowles and make them shoot her.  Martin Depo. at 320:11-14.  Martin estimated that Karen Jackson was five to seven feet away when she fired the first shot.  Id. at 320:24 to 321:2.

[32]  Knowles testified that he shot Karen Jackson because it was obvious that she was not going to stop coming toward them with the knife and he felt like his life was in danger and wanted to protect himself.  Knowles Depo. at 242:12-16.  Knowles heard at least one shot from Martin before he heard his own shot.  Knowles estimated that Karen Jackson was no more than 15 feet away when he shot her.  Knowles Recorded Interview at 30, Plaintiffs' Ex. H.

[33]  Plaintiffs contend that Knowles was 20 feet away when he shot Karen Jackson, but the scaled diagram does not support the assertion.  See Plaintiffs' Response (Doc. #183) at 25, ¶ 44(o); Plaintiffs' Exhibit AA.  Knowles testified that his shell casings would have typically gone to the left and back of him.  See Knowles Depo. at 244:3-11.  It appears that his shell casings were found about 20 feet away from where Karen Jackson stood.  See Plaintiffs' Exhibit AA (marked by C4 and C3); Knowles Depo. at 243:23 to 244:7.  It appears that Martin's shell casings were also about 20 feet away from where Karen Jackson stood.  See Plaintiffs' Exhibit AA (marked by C1 and C2).

Karen Jackson was shot in the neck, right forearm, right wrist and right thigh. See id. at 4-5. She also suffered stab wounds to her right neck, torso and right thigh. See id. at 6. The stab wounds resulted in trauma to soft tissue only and did not contribute to her death. See id. at 10. The toxicology report showed high levels of alcohol in her system. See id.

Officers found the fireplace lighter and knife on the driveway between Karen Jackson's head and the house.[34] See Plaintiff's Ex. EE, Wichita 000405. Based on reference to other objects in the photographs, the Court estimates that the fireplace lighter was approximately four feet away from Karen Jackson's head and the knife was approximately six feet away. See id., Wichita 000405, 000410-12. Karen Jackson's body was lying in a pool of blood. See id. The entire knife blade has a significant amount of blood on it. See id., Wichita 000419. The fireplace lighter also appears to have blood on it. See id., Wichita 000418.

**III.     Analysis**

Under 42 U.S.C. § 1983, plaintiffs assert that Martin and Knowles used excessive force against Karen Jackson in violation of the Fourth and Fourteenth Amendment. In addition, under

---

[34]     Martin and Knowles testified that after the shooting, they did not see the knife. Knowles lifted or rolled Karen Jackson's body, saw the knife underneath and used his boot to scoot or kick it away. In an interview after the incident, Knowles described it as follows:

> the female then fell to the ground and I noticed that she had fallen on top of the knife and . . . I'm looking for the knife to make sure it didn't fall out from underneath here [sic] and it's not anywhere in the area that we're at and I then uh have Officer Martin keep cover on uh, who I assumed is Karen [Jackson] uh with her firearm and I then uh grabbed the back pocket of Karen's uh pants to lift her up cause . . . and then I saw that the knife looked to be, it was . . . in her neck area. I don't know if it was actually cutting her but it looked the point of the knife was, fell out from her neck. I then used my uh right boot and scooted the knife out from underneath um of the female that was on the ground.

Knowles Recorded Interview at 11.

Kansas law, plaintiffs assert wrongful death and survival claims for negligence and battery against Martin, Knowles and/or the City.  Defendants seek summary judgment on all claims.  As to claims under Section 1983, defendants assert that Martin and Knowles are entitled to qualified immunity.  As to the state law claims, defendants assert that they fail as a matter of law.

### A.      Section 1983 Claims

Under Section 1983, plaintiffs assert that Martin and Knowles used excessive force against Karen Jackson in violation of the Fourth and Fourteenth Amendment.  Defendants assert that Martin and Knowles are entitled to qualified immunity because (1) they did not violate Karen Jackson's constitutional rights and (2) the alleged constitutional right was not clearly established.

When defendants assert qualified immunity on summary judgment, the burden shifts to plaintiffs to show that (1) defendants violated a constitutional right and (2) the constitutional right was clearly established.  Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009).  The Court asks whether, taken in the light most favorable to plaintiffs, the facts demonstrate that defendants violated a constitutional right and whether the right was clearly established.  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The Court has discretion to address the two prongs in any order.  Becker v. Bateman, 709 F.3d 1019, 1022 (10th Cir. 2013).  If (and only if) plaintiffs meet this two-part test, defendants bear the traditional burden of the movant for summary judgment, i.e. showing that they are entitled to judgment as a matter of law.  Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

### 1.      Whether Defendants Violated A Constitutional Right

Plaintiffs assert that Martin and Knowles used excessive force against Karen Jackson in violation of the Fourth and Fourteenth Amendments.  The Court evaluates claims of excessive

force under the reasonableness standard of the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989). To determine whether force is reasonable, the Court applies "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (quotations omitted). Because the Fourth Amendment test of reasonableness is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." Id. (citation and quotations omitted).

The Court examines the reasonableness of a particular use of force based on the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Id. (quotations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (citation and quotations omitted). The reasonableness determination must allow for the fact that in circumstances that are tense, uncertain and rapidly evolving, police officers must often make split-second judgments about the amount of force that is necessary in a particular situation. Id. at 396-97. The reasonableness inquiry is an objective one, i.e. whether in light of the facts and circumstances confronting them, the officers' actions are objectively reasonable without regard to their underlying intent or motivation. Id. at 397 (quotations omitted).

Defendants assert that as a matter of law, Martin and Knowles used force which was justified and objectively reasonable under the circumstances. See Defendants' Memorandum (Doc.#144) at 28-33. Specifically, defendants assert that at the moment Martin and Knowles shot Karen Jackson,

she posed an imminent threat of serious personal injury "when she continued approaching them with a large knife, ignoring repeated commands to stop and drop the knife." Id. at 30.

Under the Fourth Amendment, deadly force is allowed if reasonable officers in defendants' position would have had probable cause to believe that Karen Jackson presented a threat of serious physical harm to them or to others.[35] Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004); see also Tennessee v. Garner, 471 U.S. 1, 11–12 (1985). Construed in the light most favorable to plaintiffs, the record presents a genuine issue of material fact in this regard. In particular, construing the evidence in the light most favorable to plaintiffs, a fact finder could conclude that reasonable officers in defendants' position would not have had probable cause to believe that Karen Jackson threatened serious physical harm which justified the use of deadly force.

In assessing the degree of threat posed to the officers, the Court considers factors which include but are not limited to (1) whether the officers ordered the suspect to drop her weapon and the suspect's compliance with police commands; (2) whether the suspect made any hostile motions with the weapon toward the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. Estate of Larsen v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008). In the end, the inquiry is always whether based on the perspective of a reasonable officer on the scene, the totality of circumstances justified the use of force. See id.

The first factor considers whether the officers ordered the suspect to drop her weapon and the suspect's compliance with police commands. Here, undisputed evidence establishes that Martin and Knowles repeatedly ordered Karen Jackson to drop the knife and she did not do so. A jury could reasonably find that this factor weighs in favor of finding that the officers had probable cause

---

[35]     Defendants do not assert that they shot Karen Jackson because she posed a threat of harm to herself.

to believe that Karen Jackson threatened serious physical harm; however, a jury also could find that the remaining factors weigh against such finding.[36]

The second factor looks to whether the suspect made any hostile motions toward the officers with the weapon.  Construing the evidence in the light most favorable to plaintiffs, Karen Jackson did not wave the knife or make any hostile motions with the knife toward the officers.  She did however use the knife to violently stab herself several times in the chest and legs.  Although it presents a close question, a jury could reasonably find that this factor weighs against finding that the officers had probable cause to believe that Karen Jackson threatened serious physical harm which justified the use of deadly force.

The third factor looks to the distance separating the officers and the suspect.  Construing the record in the light most favorable to plaintiffs, it appears that at the time Martin and Knowles shot Karen Jackson, she stood at least ten to 15 feet from them.  She had only walked toward them and did not run or lunge.  Moreover, she walked with a noticeable limp, could not walk fast[37] and nothing prevented the officers from stepping back to create more distance.  A jury could reasonably find that this factor weighs against finding that they had probable cause to believe that she threatened serious physical harm which justified the use of deadly force.

The fourth factor considers the manifest intentions of the suspect.  Construing the evidence

---

[36]    As noted, under the Fourth Amendment, officers can use deadly force if they reasonably believe that a suspect presents a threat of serious physical harm to themselves or others.  See Jiron, 392 F.3d at 415.

[37]    Witnesses familiar with Karen Jackson testified that she had trouble with her hips, walked slowly with a noticeable limp, had difficulty going up and down steps and always needed to use a handrail.  Construing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that reasonable officers would have noticed these characteristics as Karen Jackson walked toward them.

in the light most favorable to plaintiffs, Karen Jackson had not committed a crime and did not threaten the officers or others in any way. To the contrary, it appears she was solely interested in harming herself, i.e. she stabbed herself and told the officers to "shoot me." A jury could reasonably find that this factor weighs against finding that they had probable cause to believe that she threatened serious physical harm which justified the use of deadly force.

On these facts, the record presents a genuine issue of material fact whether at the time Martin and Knowles shot Karen Jackson, they had probable cause to believe that she posed a threat of serious physical injury to them. See, e.g., Tenorio v. Pitzer, No. 12-01295 MCA/KBM, 2014 WL 11429062, at *3 (D.N.M. May 5, 2014) (overruling defendant's motion for summary judgment for qualified immunity on excessive force claim where plaintiff held small kitchen knife by thigh and made no threatening gestures toward anyone, walked toward defendant but was shot before reaching striking distance and only threatened himself); cf. Thomson v. Salt Lake Cty., 584 F.3d 1304, 1318-19 (10th Cir. 2009) (affirming summary judgment for defendants on qualified immunity on excessive force claim where suicidal suspect had threatened his wife with firearm and waived and aimed gun in direction of officers after previously stating he would pull trigger).

The reasonableness of force inquiry looks not only to whether the officers were in danger at the precise moment that they used force, but also whether the officers' own conduct unreasonably created the need to use such force. See Hastings v. Barnes, No. 04-5144, 252 Fed. App'x 197, 203 (10th Cir. Oct. 18, 2007); Allen v. Muskogee, Okla., 119 F.3d 837, 840 (10th Cir. 1997); Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir. 1995). Construed in the light most favorable to plaintiffs, the record supports an inference that defendants' own conduct unreasonably created any need to use deadly force. Karen Jackson was not a criminal suspect; she was a mentally

ill/emotionally disturbed individual who had suicidal tendencies.  Although no emergency existed, the officers did not attempt to learn information about Karen Jackson's condition from Derrick Jackson or other available resources.  Instead, they rushed to the residence with no plan how to proceed.  When they first saw Karen Jackson, she posed no threat to herself, to them or to any third parties: she stood alone on the porch, more than 30 feet away, and held a kitchen knife under her arm with other items in her hands.  Rather than attempt to talk with and/or help Karen Jackson from a distance, Martin and Knowles drew their guns, shined flashlights in her eyes and repeatedly yelled at her to drop the knife, allegedly causing her to become distressed, stab herself and scream at the officers to "shoot me."  Although Martin and Knowles continued to stand at a safe distance, they did not attempt to de-escalate the situation or form a plan to avoid the use of deadly force.  Instead, they continued to point their guns at Karen Jackson and yell at her to drop the knife.  On these facts, a jury could reasonably find that Martin and Knowles recklessly escalated the situation to a point which arguably required deadly force.  See, e.g., Hastings, 252 Fed. App'x at 203; Allen, 119 F.3d at 840-41; Sevier, 60 F.3d at 701; Tenorio, 2014 WL 11429062, at *4.  Defendants are not entitled to qualified immunity on ground that no constitutional violation occurred.[38]

### 2.      Whether Constitutional Right Was Clearly Established

Defendants assert that even if Martin and Knowles may have violated a constitutional right, the right was not clearly established on July 10, 2012.  See Defendants' Memorandum (Doc. #144) at 41-43.  The Court agrees.  Defendants are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable

---

[38]      In reaching this decision, the Court does not rely on expert testimony and therefore does not address defendants' assertion that plaintiffs' expert witness opinions are inadmissible.  See Defendants' Memorandum (Doc. #144) at 38-41.

person would have known." <u>White v. Pauly</u>, No. 16-67, 580 U.S. ___, 2017 WL 69170, at *4 (Jan. 9, 2017) (quoting <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015)).[39]   A right is clearly established if it is sufficiently clear that "every reasonable officer" would have understood that what he is doing violates that right. <u>Mullenix</u>, 136 S. Ct. at 308 (quoting <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012)).  The Supreme Court has repeatedly instructed that courts must not define clearly established law "at a high level of generality." <u>White</u>, 2017 WL 69170, at *4; <u>see also</u> <u>Mullenix</u>, 136 S. Ct. at 308; <u>City & Cty. of San Fran., Cal. v. Sheehan</u>, 135 S. Ct. 1765, 1775-76 (2015). Instead, the Court must identify clearly established law which is "particularized" to the facts of the case. <u>White</u>, 2017 WL 69170, at *4 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). Although the Supreme Court does not require a case directly on point, existing precedent must have placed the statutory or constitutional question "beyond debate." <u>White</u>, 2017 WL 69170, at *4 (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741-42 (2011)).  Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. <u>Mullenix</u>, 136 S. Ct. at 308.

Plaintiffs assert that under Tenth Circuit law, reasonable officers would have understood that defendants could not use lethal force "where a person is not suspected of any crime, is only holding a knife, not a gun, and initially did not even have the knife in her hand until the officers escalated the situation, and the suspect was not charging the officers and made no slicing or stabbing motions *towards him* [sic], and did not threaten the officers." <u>Plaintiffs' Response</u> (Doc. #183) at 68 (emphasis in original).  In support of their argument, plaintiffs cite <u>Zuchel v. City & County of</u>

---

[39]     At the status conference on December 20, 2016, the Court expressed its inclination to deny defendants' motion for summary judgment on plaintiffs' claims under Section 1983, both on the substantive issue and the question of qualified immunity.  In light of <u>White</u>, which the Supreme Court decided just two days ago, the Court now reaches a different conclusion on the issue of qualified immunity.

Denver, Colo., 997 F.2d 730 (10th Cir. 1993), and Walker v. City of Orem, 451 F.3d 1139 (10th Cir. 2006).  See Plaintiffs' Memorandum (Doc. #183) at 68.  The facts of those cases, however, are not sufficiently analogous to put defendants on fair notice that it was objectively unreasonable to use lethal force in the facts of this case.

In Zuchel, the jury found that defendant's use of deadly force was not objectively reasonable under the circumstances, and the Tenth Circuit affirmed that finding.[40]  Decedent caused a disturbance at a fast food restaurant.  He left the restaurant and became involved in a heated exchange with four teenagers on bicycles.  During the exchange, police officers approached decedent. One of the teens shouted, "Watch out: he's got a knife."  Zuchel, 997 F.2d at 736.  In fact, he did not have a knife.  Decedent turned around and took three steps toward an officer.  He was not charging the officer and made no slicing or stabbing motions toward him.  The Tenth Circuit found this evidence was sufficient to support the finding of excessive force.  The fact that evidence at trial was sufficient to support the jury finding, however, does not establish that "beyond debate," lethal force in similar circumstances is always unreasonable.  Moreover, the facts of this case are distinguishable. Unlike decedent in Zuchel, Karen Jackson clearly held a knife and refused repeated police commands to stop and drop the knife.  Moreover, Karen Jackson used the knife to violently stab herself – which especially in light of her refusal to drop the knife and stop approaching the officers, could lead a reasonable officer to believe that she would use the weapon against them.

In Walker, the district court denied summary judgment on the issue of qualified immunity

---

[40]    The Zuchel opinion which plaintiffs cite did not address qualified immunity.  In an earlier ruling before trial, the district court had overruled defendant's motion for summary judgment based on qualified immunity.  997 F.2d at 733.  On interlocutory appeal of that ruling, the Tenth Circuit affirmed, finding material fact issues whether the officer's conduct was objectionably reasonable.  See id. (citing Zuchel v. Spinharney, 890 F.2d 273, 276 (10th Cir. 1989)).

as to plaintiff's excessive force claim.  After a car chase, decedent was suicidal and holding a knife to his wrist.  Although he had previously eluded police, nearly run over an officer and driven recklessly just prior to the incident, he had not affirmatively led anyone to believe that he had a firearm and had not made any violent threats toward the officers or others.  Walker, 451 F.3d 1159-60.  The Tenth Circuit affirmed, finding that plaintiff's facts on summary judgment supported an excessive force claim.  Id. at 1160.  It also found that Zuchel had clearly established that it was unreasonable for an officer to use deadly force where he "had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him."  Id.  Here, as noted, Karen Jackson used the knife to violently stab herself and repeatedly refused to drop the knife and stop approaching the officers.

Far from clarifying the issue, excessive force cases which involve suspects with knives reveal a "hazy legal backdrop" against which defendants acted.  Mullenix, 136 S. Ct. at 309.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), for example, the Tenth Circuit affirmed a summary judgment determination that deadly force was objectionably reasonable and no constitutional violation had occurred.  Id. at 1263.  There, decedent had called 911, threatening to "kill someone or himself."  Id. at 1258.  The 911 operator dispatched officers to his house.  As they approached, decedent stood alone on the front porch with a large knife in his hands.  The officers drew their pistols and ordered him to drop the knife.  Decedent stood about seven to 12 feet from the officers.  After they ordered him to drop the knife, he appeared agitated and raised the knife above his shoulder with the blade pointed toward the officer.  Decedent refused repeated commands to drop the knife.  An officer told him to "[d]rop the knife or I'll shoot."  Id. at 1258.  Decedent turned and took a step towards the officer, who was on the sidewalk below.  The officer fired twice

and killed him.

In <u>Larsen</u>, the Tenth Circuit found that a number of undisputed facts supported the heightened immediacy of threat that the officers faced and the objective reasonableness of deadly force. These facts included the following: (1) decedent had already threatened violence against himself and others; (2) the officers responded to an emergency call late at night; (3) when the officers arrived, they encountered a man armed with a knife; (4) both officers repeatedly told him to put down the knife; (5) the knife was a large weapon with a blade over a foot in length rather than a mere pocket knife or razor blade; (6) decedent refused to cooperate with the officers' repeated orders to drop his weapon; (7) decedent held the high ground vis-a-vis the officers; (8) decedent raised the knife blade above his shoulder, pointed the tip towards an officer and took a step toward him; (9) the other officer was prepared to use force and was moving into position to be able to do so; and (10) the distance between decedent and the officer at the time of the shooting, though disputed, was somewhere between seven and 20 feet. <u>Id.</u> at 1260-61.

Many facts in this case are similar to <u>Larsen</u>. While Karen Jackson had not threatened violence against others, she had used the knife to stab herself several times – which showed a potential to use the knife violently. The officers responded to a call at night. When they arrived, they encountered an individual with a knife. They repeatedly told her to put down the knife. It was a large knife. Karen Jackson refused to cooperate with repeated orders to drop the weapon. Although Karen Jackson held the knife at waist level and not above her shoulder, she pointed the knife toward the officers. Karen Jackson continued approaching the officers with the knife and after she stopped, she took another step toward the officers. The distance between Karen Jackson and the officers was about 15 feet.

As noted, in Larsen, the Tenth Circuit agreed with the district court that as a matter of law, the officer's use of deadly force was objectively reasonable.  Id. at 1263.  The Tenth Circuit found that the facts presented a "prototypical case" in which police officers were "forced to make split-second judgments," and that even if the officer's assessment of the threat was mistaken, it was not objectively unreasonable.  Id. at 1261.  In light of this precedent and its similarity to the facts of this case, plaintiffs cannot show that the asserted right was clearly established under Tenth Circuit law.  In other words, under the facts of this case and in light of the Tenth Circuit ruling in Larsen, a reasonable officer in defendants' position could have believed that his or her conduct was legally justified.  In short, whether a reasonable officer confronted with the same circumstances would have probable cause to believe that he or she faced an immediate threat of serious physical harm – and would be justified in responding by lethal force – is "far from beyond debate."  Callahan v. Unified Gov., 806 F.3d 1022, 1028 (10th Cir. 2015).

Plaintiffs assert that the law is clearly established that defendants "cannot create a situation where force is allegedly needed and then claim the protections of qualified immunity."  Plaintiffs' Response (Doc. #183) at 68.  Plaintiffs lay out excessive force principles at a general level, however, and do not point to pre-existing law that makes apparent the unlawfulness of defendants' conduct in this case.  See White, 2017 WL 69170, at *4.  Although their argument is not clear, plaintiffs apparently assert that the law clearly established that Martin and Knowles could not unreasonably escalate the situation by "pulling their guns and yelling at Karen [Jackson] even though they both knew that she was 'mental' and . . . was not suspected of a crime."  Plaintiffs' Response (Doc. #183) at 62-63.  Plaintiffs point to no case law which clearly establishes such a proposition on

-28-

particularized facts similar to this case.[41]  See id. at 68.  On this record, plaintiffs have not shown that settled Fourth Amendment law prohibited defendants from drawing their weapons and ordering Karen Jackson to put down her knife.  Because the law did not establish "beyond debate" that defendants' actions were unconstitutional, they are entitled to qualified immunity on the excessive force claims.

### B.   State Law Claims

Against Martin and Knowles, the Estate of Karen Jackson, through its co-special administrators, asserts survival claims for negligence and battery.[42]  See Pretrial Order (Doc. #136)

---

[41]      In support of their argument, plaintiffs cite Sevier v. City of Lawrence, Kansas, 60 F.3d 695 (10th Cir. 1995), Allen v. Muskokee, Oklahoma, 119 F.3d 837 (10th Cir. 1997), and Hastings v. Barnes, 252 Fed. App'x 197 (10th Cir. 1997).  These cases are not on point or are distinguishable.  In Sevier and Allen, the Tenth Circuit did not address the question of qualified immunity.  See Sevier, 60 F.3d at 701; Allen, 119 F.3d at 841.

In Hastings, the Tenth Circuit found that the law was clearly established that "an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (i.e., running and screaming at him)."  Hastings, 252 Fed. App'x at 206.  In that case, however, officers unreasonably escalated the situation by cornering the decedent in a bedroom and using pepper spray on his face.  Here, the officers stood outside, 30 feet away, and Karen Jackson walked toward them with a knife.

The Court notes that Hastings and Larsen may be difficult for an officer to reconcile when making split-second decisions in the field.  Under Larsen, an officer is justified in using force if a suspect threatens violence, refuses to put down a weapon and makes threatening gestures toward the officer in close range.  Under Hastings, however, before using force the officer must evaluate whether his or her conduct recklessly precipitated the need to use that exact force in the exact same situation.

[42]      Under Kansas law, at least two causes of action can arise when a person is killed due the negligence of another.  See Marler v. Heibert, 960 F. Supp. 253, 254 (D. Kan. 1997).  Under K.S.A. § 60-1801, the administrator of the decedent's estate may bring suit for the decedent's injuries before death, i.e. a survival action.  See Marler, 960 F. Supp. at 254.  Under K.S.A. § 60-1902, an heir of the decedent may bring a wrongful death action for loss suffered by all heirs after the death.

at 12-13.  Also, against Martin and Knowles, the heirs-in-law of Karen Jackson assert wrongful death claims based on negligence and battery.  See id.  In addition, plaintiffs assert that under the theory of respondeat superior set forth in the Kansas Tort Claims Act ("KTCA"), K.S.A. § 75-6101 et seq., the City is liable for all damages which plaintiffs incurred as a result of negligent or wrongful acts by Martin and Knowles.  See Pretrial Order (Doc. #136) at 13.[43]

Defendants assert that they are entitled to summary judgment because (1) the negligence claims are actually battery claims; (2) the statute of limitations bars the battery claims; (3) the battery claims fail because the officers were justified in using force; and (4) Knowles and Martin are immune from liability under the KTCA.  See Defendants' Memorandum (Doc. #144) at 48-55. Defendants' motion raises complex matters of state law, including whether (1) Kansas law recognizes a claim for negligence based an intentional act of shooting another person, see id. at 48-51; (2) the Court should retroactively apply Whaley v. Sharp, 301 Kan. 192, 343 P.3d 63 (2014), to preclude the Estate's battery claims,[44] see id. at 51; and (3) under K.S.A. § 75-6104(e) and (i),

---

[43]    Plaintiffs do not specify whether they bring claims against Martin and Knowles under the KTCA.  Based on their response to defendants' motion for summary judgment, it appears that they do.  See Plaintiffs' Response (Doc. #183) at 77-82.

[44]    Defendants assert that the one-year limitations period under K.S.A. § 60-514(b) bars battery claims brought by the Estate.  See Defendants' Memorandum (Doc. #144) at 51.  Within one year of the shooting, however, on July 9, 2013, plaintiffs submitted notice to the City pursuant to K.S.A. § 12-105b(d).  See Plaintiffs' Response (Doc. #183) at 83.  Prior to 2015, Kansas courts found that Section 12-105b(d) required notice of claims against municipalities and municipal employees acting within the scope of their employment.  See King v. Pimentel, 20 Kan. App.2d 579, 589, 890 P.2d 1217, 1225 (1995) (pre-2015 version of Section 12-105b(d) required notice of claims against municipal employees acting within scope of employment).  In 2014, the Kansas Supreme Court overruled that case law and found that the statute unambiguously applied only to lawsuits against municipalities, and not to lawsuits against municipal employees.  See Whaley, 301 Kan. at 201, 343 P.3d at 69 (overruling King).  In 2015, the Kansas legislature amended Section 12-105b to expressly include claims against employees.  In response to defendants' motion for summary judgment with regard to the statute of limitations, plaintiffs assert that the Court should retroactively

(continued...)

defendants are immune from liability on plaintiffs' state law claims, see id. at 52-54.

Under 28 U.S.C. § 1367(c), the Court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. See Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006). The Court considers the nature and extent of pretrial proceedings, judicial economy, convenience and whether fairness would be served by retaining jurisdiction. Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995). In the usual case, the balance of factors points toward declining to exercise jurisdiction over the remaining state law claims. McWilliams v. Jefferson Cty., 463 F.3d 1113, 1118 (10th Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). Here, the Court finds no compelling reasons to exercise supplemental jurisdiction to decide the merits of plaintiff's state law claims. Even though the trial date is near, the state law issues raise novel and complex legal issues under Kansas law. See Thatcher Enters. v. Cache Cty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990) (notions of comity and federalism demand that state court try its own lawsuits, absent compelling reasons to contrary). Accordingly, the Court dismisses the state law claims subject to the following conditions:

(1)    All discovery in this case shall be available for use in state court proceedings; and

---

[44](...continued)
apply the 2015 amendment to Section 12-105b to their claims in this case. See Plaintiffs' Response (Doc. #183) at 82-85.

Defendants assert that plaintiffs' notice to the City under K.S.A. § 12-105b did not toll the statute of limitations on the battery claims against Martin and Knowles. See Defendants' Memorandum (Doc. #144) at 51. Defendants do not address the fact that at the time plaintiffs filed their notice, Kansas courts had interpreted Section 12-105b to require notice for claims against municipal employees. See King, 20 Kan. App.2d at 589, 890 P.2d at 1225. Likewise, defendants do not address whether Kansas courts would retroactively apply Whaley to preclude the Estate's battery claims. See, e.g., Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07 (1971) (looking to equitable factors to determine whether new rule of law applies retroactively); Pfeiffer v. Hartford Fire Ins. Co., 929 F.2d 1484, 1494 (10th Cir. 1991).

(2)     Immediately after defendants receive service of any state court suit, they shall provide a copy of the federal case file to the state judge and notify the state judge that subject to ruling on any pending motions, the case is ready for trial.

**IT IS THEREFORE ORDERED** that defendants' <u>Motion For Summary Judgment</u> (Doc. #143) filed June 27, 2016 be and hereby is **SUSTAINED in part.** The Court grants summary judgment in favor of the City of Wichita on plaintiffs' claims under 42 U.S.C. § 1983 for failure to train and unconstitutional policy in violation of the Fourth and Fourteenth Amendments. In addition, the Court finds that Elizabeth Martin and Bryan C. Knowles are entitled to qualified immunity on plaintiffs' claims under 42 U.S.C. § 1983 for excessive force in violation of the Fourth and Fourteenth Amendments. The Clerk is directed to enter judgment in favor of defendants on plaintiffs' claims under Section 1983.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims and therefore dismisses the state law claims for lack of subject matter jurisdiction.

Dated this 11th day of January, 2017 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge

-32-